648 P.2d 780

**Oretta J. NICHOLS, Petitioner-Appellant and Cross-Appellee,**

v.

**Eddie E. NICHOLS, Respondent-Appellee and Cross-Appellant.**

**No. 13641.**

Supreme Court of New Mexico.

June 24, 1982.

Rehearing Denied July 19, 1982.

O'Reilly & Huckstep, Lee Huckstep, Ruidoso, for petitioner-appellant and cross-appellee.

Charles E. Hawthorne, Ruidoso, for respondent-appellee and cross-appellant.

## OPINION

PAYNE, Justice.

Petitioner Oretta Nichols (Wife) filed suit for dissolution of her marriage to Respondent Eddie Nichols (Husband). At the conclusion of a hearing conducted in November 1980, the district court orally granted the divorce and decided property, support and child custody issues. The court entered final judgment December 30, 1980. Seventy-one days later, on March 11, 1981, the district court entered a second final judgment. Wife appeals the entry of the second judgment; Husband cross-appeals the court's treatment (in both judgments) of some of his separate property.

The following facts appear in the record. At the close of the November hearing, the court announced that the couple's residence was community property and that Wife "may live there and make the monthly payments if she wants to do so, and she will be credited with principal reduction upon sale." The court also awarded Wife $300 in attorney's fees and ordered that Husband pay child support:

> During the time he works for Dial Electric, he will pay $150 per month child support * * *. That will accrue from November 1, 1980, but the legal requirement will be $200 a month that accrues from that date, and that will be up to $200 when his employment changes, or he returns to work for Continental Telephone Company.

Both parties subsequently submitted proposed findings of fact and conclusions of law. Husband's addressed only the separate property status of the couple's residence. On December 30, 1980, the court entered its first final judgment, including the following provisions:

> 3. Respondent is hereby ordered to pay the sum of $200.00 per month as and for child support with said obligation incurring from November 1, 1980. Further, that during the pendency of the time that Respondent works for Dial Electric, he will pay the reduced sum of $150.00 per month, with the $200.00 per month obligation resuming when Respondent returns to work for Continental Telephone Company of the West. The difference between the $150.00 per month obligation and the $200.00 per month obli-

gation shall be made current upon Respondent's return to work for Continental Telephone Company of the West.

\* \* \* \* \* \*

7. Respondent is hereby ordered to maintain the medical insurance programs upon the minor children of the parties until they attain the age of majority.

8. Respondent is hereby ordered to pay the sum of $750.00 as and for Petitioner's attorney fees to Petitioner * * *.

9. Respondent is hereby ordered to pay the sum of $161.12 per month as and for the house payment on the family home of the parties and will be credited with the principal reduction thereon upon the sale of the property.

On January 21, 1981, Wife filed her "Proposed Supplemental Findings of Fact and Conclusions of Law," which repeated some of her earlier proposals. On February 2, Husband filed a second set of proposed findings and conclusions, adding to his first proposals some which addressed the issues of child support and attorney's fees. On March 11, the district court entered its second final judgment without stating that it had withdrawn its first judgment. The court largely repeated its previous orders, including the child support provision. However, the court omitted the order that Husband maintain medical insurance for the children, and substituted these provisions for the earlier ones:

7. Respondent is hereby ordered to pay the sum of $300.00 as and for Petitioner's attorney's fees * * *.

8. Petitioner shall make the monthly payments upon the family home and will be credited with the principal reduction thereon upon the sale of the property.

### I.

The first issue is whether the district court properly entered the second final judgment. Wife identifies three provisions under which the trial court might have had the authority to modify, reopen, or vacate the first judgment: Section 39–1–1, N.M.S. A.1978; Rule 60(b), N.M.R.Civ.P., N.M.S.A. 1978; Section 40–4–7, N.M.S.A.1978. She

argues that the court's action was improper under any of the provisions.

### A.

Our determination of the propriety of the court's action depends on our examination of the record before us on appeal. This record is somewhat confusing and requires that we deal first with procedural issues before we can reach the substantive matters raised.

The record on appeal sent up from the district court contains a transcript of the testimony at the November hearing, two sets of findings of fact and conclusions of law proposed by each party, and two final judgments with supporting findings and conclusions. It does not include a transcript of any other hearing, nor does it include any motion to reconsider or vacate the first judgment or an order to set aside that judgment.

Wife contends that the record below is totally devoid of any motion, made by either Husband or the trial court, for relief from the judgment, or any action taken by the court within 30 days of the entry of the first judgment. Husband maintains that on January 19, 1981, the district court conducted a hearing on Husband's motion to review the judgment, and that counsel for both parties attended. He also asserts that although there was no formal written order setting aside the judgment and no record of the action, the court did set aside the first judgment at the January hearing and requested that the parties file new proposed findings, conclusions and judgment.

Husband's assertions concerning the proceedings below are contained in his "Suggestion of Diminution of Record and Motion for Writ of Certiorari" filed in this Court the same day he filed his answer brief. Husband requested that we "issue a Writ of Certiorari ordering the trial court to file its certificate certifing [sic] that the December 30, 1980, judgment was set aside on January 19, 1981, at the hearing to review the judgment." We treated his motion as one to correct the record pursuant to Rule 8(f),

N.M.R.Civ.App., N.M.S.A.1978, and, after hearing arguments, denied it.

Rules 7 and 8 of the Rules of Appellate Procedure for Civil Cases, N.M.S.A.1978, govern the contents and the procedure for challenging or enlarging the record on appeal. Our rules place the primary burden of properly preparing the record on the appellant. *See also, e.g., Flower v. Willey,* 95 N.M. 476, 623 P.2d 990 (1981); *General Services Corp. v. Board of Com'rs,* 75 N.M. 550, 408 P.2d 51 (1965); *Berkstresser v. Voight,* 63 N.M. 470, 321 P.2d 1115 (1958). However, the appellee shares some of that burden. *See, e.g.,* N.M.R.Civ.App. 7(b), (e).

Here, both Wife and Husband appealed from portions of the judgment and requested the entire record proper except for summonses and notices of depositions. Neither excluded any post-judgment motions or orders to vacate judgment in their requests.[1] Although neither party filed a written request that the reporter prepare any transcript of proceedings, the skeleton transcript *filed by Wife* and the record proper contain the reporter's certification "that Appellants have made satisfactory arrangements for the payment of the cost of the transcript of proceedings," and a transcript of the November hearing appears in the record on appeal. Because Wife did not file a description of the parts of the proceedings which she intended to include in the transcript, we can only conclude that she had ordered the entire transcript of proceedings. *See* N.M.R.Civ.App. 7(b).

Husband did not file any objection to the transcript of proceedings in the district court, which would have permitted it to correct anything amiss, such as the lack of transcript of the alleged January hearing. *See id.* Nor did he avail himself of the provisions of Rule 7(c), which would permit him to prepare a statement of the unreported January proceeding and submit it, along with Wife's objections, to the district court for settlement, approval, and inclusion in

the record on appeal. The fact that the transcript on appeal had already been filed in the Supreme Court would not have prevented him from preparing such a statement; this correction of the record was not the type requiring leave of the appellate court under Rule 60(a), N.M.R.Civ.P., N.M.S.A.1978 (Repl.Pamp.1980). *See, e.g., Beyer v. Montoya,* 75 N.M. 228, 402 P.2d 960 (1965); *Telephonic, Inc. v. Montgomery Plaza Company, Inc.,* 87 N.M. 407, 534 P.2d 1119 (Ct.App.1975). Rule 8(f), N.M.R.Civ. App., provides that the record may be corrected by the district court "either before or after the transcript on appeal is transmitted to the appellate court."

■ We denied Husband's motion to correct the record because we did not feel compelled to direct the district court to correct it when Husband failed to take advantage of these other methods. This is in line with "the familiar principle of appellate practice that relief which may be afforded by the district court must ordinarily be sought there before application therefor may be made" to the appellate court. 9 Moore's Federal Practice ¶ 210.08[2], at 10–58 (2d ed. 1982). We consider this appeal on the basis of the record as it was originally transmitted to us.

### B.

Section 39–1–1, N.M.S.A.1978, states that a final judgment of a district court

shall remain under the control of such [court] for a period of thirty days after the entry thereof, and for such further time as may be necessary to enable the court to pass upon and dispose of any motion which may have been filed within such period, directed against such judgment; provided, that if the court shall fail to rule upon such motion within thirty days after the filing thereof, such failure to rule shall be deemed a denial thereof * * *.

---

1. Wife requested "[t]he complete record, excepting summonses, notices of depositions, notices of setting, entries of appearance, transcript of trial testimony, transcript of arguments to court subsequent to actual trial."

Husband requested "the entire record in this case, including all pleadings and depositions, EXCEPT Summons and Notices to take depositions."

Wife argues that the trial court had no jurisdiction under the statute to enter the second judgment 71 days after the entry of the first. Not only was the second judgment filed 41 days after the statutory period ended, but Husband did not file within the 30-day period a motion against the judgment, which would have given the court only an additional 30 days in which to rule on the motion. *See National American Life Insurance Co. v. Baxter*, 73 N.M. 94, 385 P.2d 956 (1963).

■ The fact that the record does not reflect that Husband timely filed a motion against the first judgment is not fatal. The district court is authorized under Section 39–1–1 to change, modify, correct or vacate a judgment on its own motion. *Desjardin v. Albuquerque Nat. Bank*, 93 N.M. 89, 596 P.2d 858 (1979); *Arias v. Springer*, 42 N.M. 350, 78 P.2d 153 (1938).

■ Did the trial court so move? The record is devoid of such a motion. However, in their supplemental briefs, *both* parties, while not agreeing on much else, do state that they both met with the trial judge on January 19, 1981, and that at the close of their meeting the judge requested that they submit new proposed findings of fact and conclusions of law. "[T]he express * * * admissions of the briefs may be recognized as properly filling a hiatus in the transcript." *Royko v. Griffith Company*, 147 Cal.App.2d 770, 306 P.2d 36, 40 (1957). We therefore deem it established for the purposes of this appeal that there was a January hearing at which the trial court requested the parties to submit new findings and conclusions. *See Houghton v. City of Long Beach*, 164 Cal.App.2d 298, 330 P.2d 918 (1958); *Pringle v. Hunsicker*, 154 Cal. App.2d 789, 316 P.2d 742 (1957); *H. Moffat Co. v. Rosasco*, 119 Cal.App.2d 432, 260 P.2d 126 (1953). *See also Territory v. County Commissioners*, 13 N.M. 89, 79 P. 709 (1905); *Cornell v. Albuquerque Chemical Co., Inc.*, 92 N.M. 121, 584 P.2d 168 (Ct.App.1978); *Anderson v. Jenkins Construction Co.*, 83 N.M. 47, 487 P.2d 1352 (Ct.App.1971).

"We have a well established rule that upon a doubtful or deficient record, every presumption is indulged in favor of the correctness and regularity of the decision of the trial court. * * *" *Fisher v. Terrell*, 51 N.M. 427, 429, 187 P.2d 387, 388 (1947). Therefore, although there is no record of the trial court's moving to vacate the first judgment or so ordering, we infer from the hearing, the court's request for new proposed findings and conclusions, and the parties' compliance with the request that the trial court on January 19 did vacate the first judgment on its own motion. That action was timely under Section 39–1–1.

■ Was the trial court's action proper? The district court's power under Section 39–1–1 is discretionary. We adopt the statements of the Court of Appeals that

We are not inclined to hold * * * that this right of control [over judgments] is absolute and there are no restraints on its exercise. The action of a court must always be supported by a good reason. [Citation omitted.] However, the discretion vested in the trial courts in the exercise of control over their judgments under § 21–9–1 [now codified as § 39–1–1], supra, is extremely broad.

*Laffoon v. Galles Motor Company*, 80 N.M. 1, 3–4, 450 P.2d 439, 441–42 (Ct.App.1969). An appellant bears a heavy burden to show on the record "a patent abuse or manifest error in the exercise of the discretion." *Hanberry v. Fitzgerald*, 72 N.M. 383, 387, 384 P.2d 256, 259 (1963) (citations omitted). *See also Battersby v. Bell Aircraft Corporation*, 65 N.M. 114, 332 P.2d 1028 (1958). In light of the deficiencies in the record in this case, we hold that the court's setting aside the first judgment was proper. *See Fisher v. Terrell, supra.*

■ Once the district court vacated its first judgment, the status of the case was as though the first judgment had not been entered. *Arias v. Springer, supra.* The court was then free to enter its second judgment. The fact that the court did not state in the second judgment that the first had been vacated or withdrawn is irrelevant, especially in light of the rule that when there are two conflicting judgments

rendered by a court upon the same rights of the same parties that which is later in time prevails. *See Cummins v. Mullins*, 183 Ky. 666, 210 S.W. 170 (1919); *Mahan v. Kyle*, 211 S.W. 302 (Tex.Civ.App.1919); *Cootey v. Remington*, 108 Vt. 441, 189 A. 151 (1937). We therefore hold that the district court did not commit error in entering the second final judgment.

Because we uphold the court's action on the basis of Section 39–1–1, we need not consider its propriety under Rule 60(b) or Section 40–4–7.

## II.

The second issue is whether the trial court erred in concluding that the parties' Ruidoso residence was community property. The parties were first married in 1972; during marriage they resided in the Roswell house, which Husband had purchased in 1970. The decree granting their first divorce in May 1975 incorporated an agreement that the Roswell house remain Husband's separate property, subject to a community lien for the amount of community funds expended on it. The parties remarried in June 1975 and Husband subsequently sold the Roswell house and placed the proceeds in the parties' joint savings and joint checking accounts. The down payment for the Ruidoso house and all the payments on the real estate contract were made from the joint checking account. The real estate contract was in the name of both parties, as husband and wife. On the basis of this evidence the trial court found that Husband made a gift of his separate funds to the community, and concluded that the Ruidoso house was community property.

 Property acquired by either or both spouses during their marriage is presumptively community property. *See* § 40–3–8, N.M.S.A.1978; *Estate of Fletcher v. Jackson*, 94 N.M. 572, 613 P.2d 714 (Ct.App.), *cert. denied*, 94 N.M. 674, 615 P.2d 991 (1980). A party asserting that

such property is separate has the burden of presenting evidence that would rebut the presumption by a preponderance of the evidence. *Estate of Fletcher, supra; Campbell v. Campbell*, 62 N.M. 330, 310 P.2d 266 (1957). "Property acquired in community property states takes its status as community or separate property at the very time it is acquired, and is fixed by the manner of its acquisition." *Laughlin v. Laughlin*, 49 N.M. 20, 37, 155 P.2d 1010, 1020 (1944) (citations omitted). The determination of its legal status as separate or community property is merely the initial inquiry, however, because the spouses are permitted to change the property's status. *Estate of Fletcher, supra; In re Trimble's Estate*, 57 N.M. 51, 253 P.2d 805 (1953). Once the community property presumption is overcome by a preponderance of the evidence, a party must prove the transmutation of the separate property into community property by clear and convincing evidence. *See Corley v. Corley*, 92 N.M. 716, 594 P.2d 1172 (1979);[2] *In re Trimble's Estate, supra.* Here, Husband carried his burden of persuasion by proving by a preponderance of the evidence that the proceeds from the sale of the Roswell house were his separate property and were deposited in the parties' joint accounts. The real issue before us is whether transmutation of the separate funds into community property was proven by clear and convincing evidence. The court in *Estate of Fletcher, supra*, stated the rule governing that determination:

> It is for the fact finder, in this case the trial court, to determine whether the proof requirement has been met; the appellate court reviews the evidence in the light most favorable to the prevailing party and determines whether the fact finder could properly have determined whether the proof requirement had been met.

*Id.* at 575, 613 P.2d at 717.

 Husband argues that the trial court erred in finding that the execution of the

2. We note that *Corley* is the only New Mexico case we have found in which the clear and convincing proof standard was applied in deciding whether separate property was transmuted into community property. The rest of the cases in which that standard was applied have involved determinations of whether community property was transmuted into separate property.

real estate contract on the Ruidoso house in both parties' names constituted a gift of Husband's separate property to the community. He contends that in *Corley v. Corley, supra,* we held that a deed alone cannot be relied on as substantial evidence that a gift was intended. However, in *Corley* we were examining the issue of transmutation in the light of Section 47–1–16, N.M.S.A.1978, *see* Shapiro, *Domestic Relations and Juvenile Law,* 11 N.M.L.Rev. 135, 141 n.25 (1980–81), which is not applicable here because it deals with joint tenancy. Also, our holding in that case was that "in reviewing a trial court finding of joint tenancy * * * a joint tenancy deed alone is insufficient to constitute substantial evidence to uphold the finding in the face of contrary evidence." *Ohl v. Ohl,* 97 N.M. 175, 176, 637 P.2d 1230, 1231 (1981). Although the real estate contract is not conclusive and is not, by itself, substantial evidence on the issue of transmutation, it at least constitutes some evidence of intent to transmute. The form of the contract was not the only evidence on which the trial court based its finding of transmutation.

Husband testified "that he did not intend to make a gift of his separate property to [Wife]," and asserts that "[t]he only evidence introduced at trial which would shed any light on the reason for taking the title to the Ruidoso house in both names was [Husband's] testimony that he intended to make a devise of the Ruidoso home to [Wife]." He maintains that because his reason for naming her in the contract was to avoid probate, the trial court should have held that the deed was revocable. However, the record does not reflect that Husband raised the issue of revocable deed below,[3] and he clearly did not request any finding of fact or conclusion of law on the issue. Therefore we will not consider it. *See DesGeorges v. Grainger,* 76 N.M. 52, 412 P.2d 6 (1966).

Husband's second argument is that placing the separate funds into the joint accounts did not constitute a gift. He asserts that under *Menger v. Otero County State Bank,* 44 N.M. 82, 98 P.2d 834 (1940), proof of the act of opening a joint bank account is insufficient to establish a gift; proof of intent to make a gift, *LeClert v. LeClert,* 80 N.M. 235, 453 P.2d 755 (1969), and proof of delivery, *Burlingham v. Burlingham,* 72 N.M. 433, 384 P.2d 699 (1963), are also required. Here, the only evidence presented was that Husband's separate funds were placed into bank accounts in which Wife had unlimited rights of withdrawal. Wife admitted that they never discussed Husband's making a gift. Husband also asserts that the fact that Wife had unlimited rights to withdraw the funds has no legal significance unless the separate funds cannot be traced; here, the funds are easily traceable and Wife never showed that they were expended for anything except the purchase of the Ruidoso house.

■ Husband's argument is specious. No doubt he bases his contention on those cases which hold that "when separate property has been so intermingled with community property that the separate property cannot be traced or identified, it falls under the presumption of community property," *Conley v. Quinn,* 66 N.M. 242, 252, 346 P.2d 1030, 1036 (1959) (citations omitted). *See, e.g., Burlingham v. Burlingham, supra.* Those cases, however, involved the transmutation of property by operation of law; "[t]he general presumption in favor of community property which is the distinguishing feature of the community property system requires that the confused mass or funds be treated as community property." Clark, *Transmutations in New Mexico Community Property Law,* 24 Rocky Mtn.L.Rev. 272, 282 (1952) (footnotes omitted). In other words, when the separate property cannot be traced, the evidence of the separate status is insufficient to overcome the presumption of community property and transmutation is deemed by operation of law to have been proven by clear and convincing evi-

---

**3.** The deed was never introduced into evidence. In fact, the record shows that the deed was never the subject of testimony at trial; the testimony only addressed the real estate contract.

dence. *Cf. Newton v. Wilson*, 53 N.M. 480, 486–87, 211 P.2d 776, 779–80 (1949) (Sadler, J., dissenting) (noting that with such commingling transmutation is found "irrespective of intention on the part of the spouses"). The fact that separate property can be traced does not mean that the act of commingling is not a circumstance to which the court may look when determining the separate property owner's intent. Ability to trace the separate funds merely prevents the determination of transmutation by operation of law; it does not deprive a trial court of the ability to consider the commingling, along with other evidence, in deciding whether transmutation took place. The trial court properly considered the act of commingling along with the other evidence presented.

Husband's next contention, that there was not sufficient evidence to support the finding of transmutation by gift, is based on two grounds: 1) there was no proof of intent to make a gift to the community; and 2) there was no proof of delivery because there was no evidence that Wife had control over the disbursement of the separate funds except to accomplish the purchase of the house. The trial court considered evidence concerning both the real estate contract and the joint bank accounts in finding that there was a gift; therefore, we will examine all that evidence.

The only direct evidence of Husband's intent was his answer to the following question:

Q: * * * Did you ever intend to make a gift of your separate property interest in that house to her?

A: No.

However, he also testified as follows:

Q: And now, isn't it true that at the time you bought that property that you intended to buy it as husband and wife?

A: That's the way we bought it, but I intended for us to be husband and wife from here on out. I didn't figure she was going to run me off.

Q: But when you actually purchased it, you did purchase it with the intention in your mind of purchasing it together with Oretta as husband and wife, didn't you?

A: Yes, I did, so long as we were married. I figured we were going to be married for the rest of our life, too.

Q: Did you ever tell Oretta Nichols that her interest would cease to be in the event that you all divorced?

A: No, I didn't figure we were going to get a divorce.

 * * * * * *

Q: * * * When you and your wife purchased this house in Ruidoso in 1975, did you and she have any discussions about you making a gift of your separate property into this house to her?

A: No.

Q: Did you have any discussions with her about taking the house in both of your names?

A: Yes, because if we didn't, if I was killed, it would go through some kind of court.

Q: So, you were trying to avoid probate; is that your testimony?

A: Yes.

Q: Is that the reason you put it in both your names?

A: If I was killed, and I wanted the house to go to her and the kids.

 * * * * * *

Q: Mr. Nichols, could you explain to me why you had this discussion with Oretta Nichols when you bought the house, the subject matter of which was why you put her name on the contract?

A: Well, we had to have both our names on these. If just mine went on there, if I was killed, it would go to Probate Court, and besides, it was going to be our house.

 * * * * * *

Q: It's correct that you wanted it to be yours and Oretta's; is that correct?

A: Yes.

Q: But you don't any longer want it to be yours and Oretta's, you want it to be all yours; is that what you're telling us?

A: No, sir. That's not what I'm telling you. If she had stayed married to me, it would still be ours, but as long as she's going to kick me out and take everything, I'm not going to * * * [sic].

From this testimony, the trial court could properly infer that Husband intended Wife to have a legal interest in the house. The execution of the contract in the names of "Eddie D. Nichols and Oretta J. Nichols, husband and wife" supports the inference, and confers the status of community property on their interests. See §§ 47–1–15, –36, N.M.S.A.1978.

The commingling of the separate funds with community funds also supports the trial court's inference that Husband made a gift to the community. Not all of the proceeds from the sale of the Roswell house ($4,634.61) were expended on the Ruidoso house; after making the downpayment, $1,500 of the proceeds·was left in the joint savings account, $434.61 was left in the joint checking account, and $200 was taken in cash. Husband contends that Wife never showed that those proceeds were expended for anything other than the purchase of the house. However, Husband testified that they withdrew the funds from the savings account whenever they needed them, and that *some* of the withdrawn funds were used to pay the downpayment; he also testified that Wife, who was "about the only one" who wrote checks on the checking account and had the only checkbook, frequently drew checks on the account. Other evidence also supports the Wife's position. All the payments on the real estate contract were made from the joint checking account, undisputedly from community funds; the numbers of the checks for those payments are not consecutive, indicating that many other expenditures were made from the account. Husband never rebutted this testimony which clearly indicates that he intended the balance of the separate money to be treated as community property.

The finding of transmutation by gift is supported by substantial evidence.

We also hold this evidence to be such that "the mind of the factfinder could properly have reached an abiding conviction as to the truth of the fact or facts found." *Duke City Lumber Company, Inc. v. Terrel*, 88 N.M. 299, 301, 540 P.2d 229, 231 (1975) (citations omitted). Therefore it meets the test of being not only substantial evidence, but also clear and convincing. We therefore affirm the court's findings of transmutation and conclusion that the Ruidoso house was community property.

The final judgment of March 11, 1981, is hereby affirmed.

IT IS SO ORDERED.

EASLEY, C. J., and FEDERICI and RIORDAN, JJ., concur.

SOSA, Senior Justice, respectfully dissents.